THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| LUDVIK ELECTRIC COMPANY,<br><br>Plaintiff,<br><br><br>v.<br><br>VANDERLANDE INDUSTRIES, INC.<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [64] DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00462-DBB-CMR<br><br>District Judge David Barlow |

Defendant Vanderlande Industries, Inc. ("Vanderlande") moves for partial summary judgment on Plaintiff Ludvik Electric Co.'s ("Ludvik") claims for negligent misrepresentation, breach of contract, and breach of good faith and fair dealing,[1] pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the court grants Vanderlande's motion in part and denies it in part.

## BACKGROUND

In 2013, the Salt Lake City Corporation awarded HDJV Big-D Construction, a Joint Venture ("HDJV") a contract for construction on the Salt Lake City International Airport ("the Airport Project").[2] In 2016, HDJV subcontracted with Vanderlande to perform installation on a baggage handling system.[3] In turn on June 20, 2017, pursuant to a prior agreement, known as the Installation Service Agreement ("ISA"),[4] Vanderlande and Ludvik entered into a Project Subcontract Agreement ("PSA") under which Ludvik would perform mechanical and

---

[1] Mot. for Summ. J. (Partial) ("Def.'s Mot.") 1, ECF No. 64.
[2] Aff. of Douglas C. Alewelt ("Alewelt Aff.") ¶ 3, ECF No. 65-5.
[3] *Id.* at ¶ 4.
[4] Installation Service Agreement ("ISA"), ECF No. 34-1.

electrical work on the baggage handling system.[5] Ludvik also had a direct subcontract with

HDJV to perform electrical work in the airport renovation.[6]

       If there were changes to the work schedule that would impact Ludvik, the ISA

provided that the sum owed to Ludvik and the time allotted for work could be adjusted by a

written "change order."[7] Under ISA 9.2.2, if the change was initiated by HDJV, Ludvik was

to submit the change order to Vanderlande "no later than two (2) business days prior to the

expiration of the time period specified in the Main Contract for the submission of such request

and shall include all information required under the Main Contract."[8] Ludvik's "entitlement to

additional compensation" was "limited to the cost and schedule adjustments approved by

[HDJV] for [Ludvik's] Work in [HDJV's] change order to [Vanderlande] under the Main

Contract."[9] Similarly, ISA 11.2 provided that when Ludvik had a claim against HDJV,

Vanderlande

> may submit [Ludvik's] claims to [HDJV] provided that (a) [Ludvik] has submitted
> notices and claim documents in the form required by the Main Contract and in sufficient
> time for [Vanderlande] to comply with the deadlines provided in the Main Contract; and
> (b) [Ludvik] shall accept the [Vanderlande's] prosecution of such claims at [Ludvik's]
> expense and [Vanderlande's] payment to [Ludvik] of any money that [Vanderlande]
> may receive from [HDJV] upon [Ludvik's] claims.[10]

       In January 2019, Ludvik advised Vanderlande that it had pass-through claims to assert

against HDJV for changes in scheduling that allegedly caused unanticipated losses to

Ludvik.[11] According to Ludvik, the pass-through claims against HDJV amounted to over $9.4

million.[12]

---

[5] Alewelt Aff. ¶ 4; *see also* Project Subcontract Agreement ("PSA"), ECF No. 34-2.
[6] Alewelt Aff. ¶ 5.
[7] ISA ¶ 9.1.
[8] *Id.* at ¶ 9.2.2.
[9] *Id.*
[10] *Id.* at ¶ 11.2.
[11] Alewelt Aff. ¶ 7.
[12] *See* Am. Compl. and Jury Demand ("Am. Compl.") ¶ 48, ECF No. 34, filed November 3, 2021.

After Vanderlande received notice of Ludvik's intent, Vanderlande notified HDJV that "Vanderlande has been actively squelching Ludvik [sic] claims," but that nonetheless, Vanderlande was expecting to receive Ludvik's claim by mid-February 2019.[13] Over the course of 2019, Ludvik, Vanderlande, and HDJV exchanged numerous communications regarding Ludvik's pass-through claims.[14] Vanderlande repeatedly told Ludvik that its pass-through claim was "non-compliant," and refused to present it to HDJV.[15] In May 2019, Ludvik and Vanderlande met twice in an effort for Ludvik to present the details of their claim and for the parties to "get closer to a common understanding of what constitutes a complete submittal to HDJV."[16] Unbeknownst to Ludvik, in July 2019, HDJV sought Vanderlande's signature on Change Order 22, which stated: "It is agreed and understood that all costs for changes initiated prior to January 1, 2019 have been received by HDJV and that no additional cost for change initiated during 2018 will be accepted."[17] Before signing on July 26, 2019, Vanderlande confirmed with HDJV that signing Change Order 22 would not waive Ludvik's claim that was still being developed.[18]  Finally, on July 28, 2019 and August 9, 2019, Ludvik submitted their claim to Vanderlande, and Vanderlande passed the claim on to HDJV on August 15, 2019.[19]

HDJV rejected Ludvik's pass-through claim and notified Vanderlande of this rejection on October 1, 2019.[20] One of the reasons for this rejection—and indeed the reason for rejection that is now the subject of this litigation—was because Ludvik's claim was not

[13] Feb. 3, 2019 Letter from Alewelt to Lewis, ECF No. 73-7.
[14] Feb. 12, 2019 Letter from Reinstein to Alewelt, ECF No. 73-8; Feb. 18, 2019 Email from Alewelt to Lewis, ECF No. 73-9; May 21, 2019 Email from Alewelt to Lewis, ECF No. 73-2; July 23, 2019 Email from Alewelt to O'Connor, ECF No. 65-7; July 25, 2019 Email from Monroe to Alewelt, ECF No. 65-8.
[15] *See, e.g.*, May 20, 2019 Email from Alewelt to Reinstein 1–4, ECF No. 73-11 ID 1246.
[16] May 21, 2019 Email from Alewelt to Lewis.
[17] *See* Alewelt Aff. ¶ 14; Change Order 22, ECF No. 65-6.
[18] *See* Alewelt Aff. ¶ 15; July 25, 2019 Email from Monroe to Alewelt.
[19] *See* Oct. 7, 2019 Letter from Alewelt to Reinstein ("Oct. 7 Email") 3, ECF No. 73-11.
[20] Oct. 1, 2019 Letter from Lewis to Alewelt ("Oct. 1 Letter"), ECF 65-2.

preserved by Change Order 22.[21] Specifically, the letter stated: "HDJV may time bar for any change request more than 5 days old. HDJV has been reasonable in waiting for Vanderlande to provide substantiation of changes that exceeds 5 days, but 2 years after the fact will not be considered and is not supported by any Subcontract language."[22] Further, the letter includes excerpts of two prior communications from HDJV to Vanderlande that establish cut-off dates for changes to be sent to HDJV, with the only exceptions being changes listed on a "Change Order Log."[23] While the Change Order Log was not included with the October 1 letter, the letter states: "The proposed change/claim is time barred."[24]

Vanderlande notified Ludvik of the rejection by email on October 7, 2019.[25] And while the October 7 email provided some information as to the reasons for HDJV's rejection, it did not include mention of Change Order 22 or any waiver of claims not included on the Change Order Log.[26] The October 7 email concludes: "This Ludvik path toward resolution of disputed inefficiency costs has reached an end point. Vanderlande is available to discuss your recommended way forward to resolve all commercial issues, including, as previously suggested by Vanderlande, a negotiated settlement."[27]

On December 6, 2019, Vanderlande signed Change Order 26, which contained a waiver similar to the one contained in Change Order 22.[28] Next, on December 12, 2019, Vanderlande forwarded HDJV's October 1 letter to Ludvik.[29] Vanderlande did not provide Ludvik copies of any change order that waived Ludvik's claims or the accompanying Change

---

[21] Alewelt Aff. ¶ 18; Oct. 1 Letter ¶ 6.
[22] Oct. 1 Letter ¶¶ 2.d.
[23] *Id.* at ¶ 6.
[24] *Id.*
[25] Oct. 7 Email.
[26] *Cf.* Oct. 7 Email.
[27] *Id.* at 2.
[28] Change Order 26, ECF No. 65-13.
[29] *See* Dec. 18, 2019 Email from Reinstein to Alewelt ("Dec. 18 Email"), ECF No. 65-9.

Order Log that listed and preserved the pending claims against HDJV.[30] Ludvik replied to Vanderlande's December 12 communication on December 18, 2019.[31] This letter asserts that Vanderlande had failed its obligations to pass through an appropriate claim to HDJV; but nowhere in the letter does Ludvik ask for clarification on whether its claims were time barred, as was suggested in the October 1 letter.[32] Vanderlande replied on January 15, 2020.[33] In this letter, Vanderlande took the position that Ludvik's claim simply did not meet the form and content requirements for submission to HDJV.[34] Nowhere in the January 15 letter does Vanderlande mention HDJV's assertion that Ludvik's claim was time barred; indeed, it suggests that further support and documentation could result in a valid claim, and that Vanderlande would be open to "meeting to resolve" the issue.[35]

In June 2020, Ludvik and Vanderlande attended a mediation in Atlanta, Georgia.[36] The mediation resulted in a Memorandum of Understanding ("MOU"), executed June 12, 2020.[37] The parties entered into a final "Settlement, Release, and Pass-Through Agreement" ("Ludvik-Vanderlande Settlement Agreement"), signed August 24, 2020 and August 27, 2020 by Ludvik and Vanderlande respectively.[38] Under the Ludvik-Vanderlande Settlement Agreement, Vanderlande agreed to pay Ludvik $3.9 million in exchange for Ludvik's release of all of its claims against Vanderlande arising from the airport project, except Ludvik's pass-

---

[30] Alewelt Aff. ¶¶ 18–20.
[31] Dec. 18 Email.
[32] Id.
[33] Jan. 15, 2020 Letter from Alewelt to Reinstein ("Jan. 15 Letter"), ECF No. 73-3.
[34] Id. at 1–2.
[35] Id. at 2.
[36] Alewelt Aff. ¶ 21.
[37] See Memorandum of Understanding ("MOU"), ECF No. 73-13.
[38] Settlement, Release, and Pass-Through Agreement ("Ludvik-Vanderlande Settlement"), ECF No. 65-1.

through claims against HDJV.[39] Vanderlande also agreed to "reasonably cooperate with [Ludvik] regarding the pursuit of" Ludvik's pass-through claims.[40]

Several events happened after Ludvik and Vanderlande settled. First, between August and December of 2020, Vanderlande signed Change Orders 32 through 36.[41] None of these Change Orders included waiver language similar to what was included in Change Orders 22 and 26. Second, Vanderlande assisted Ludvik in preparing another claim and passing it on to HDJV.[42] And third, in December 2020, Ludvik, Vanderlande, HDJV, and Salt Lake City Corporation attended a mediation that was to include, among other things, Ludvik's pass-through claims against HDJV.[43]

Following the HDJV mediation, on December 9, 2020, Ludvik settled its direct claims against HDJV and the Salt Lake City Corporation for $24 million with "no payment" for the pass-through claims.[44] In the HDJV-Ludvik Settlement Agreement, Ludvik expressly reserved any claims it had against Vanderlande.[45] Ludvik granted a waiver to HDJV for the pass-through claims and agreed to indemnify HDJV for any claim asserted by Vanderlande against HDJV that arose from Ludvik's work.[46]

---

[39] *Id.* at ¶¶ 2, 5.

[40] *Id.* ¶ 6.

[41] Change Orders 32 through 36, ECF No. 65-14.

[42] *See* Alewelt Aff. ¶¶ 24–25; Nov. 5, 2020 Letter from Alewelt to Tyler 1, ECF No. 73-14.

[43] *See* Settlement and Release Agreement ("Ludvik-HDJV Settlement") 1–2, ECF No. 65-11.

[44] *Id.* ¶ 3.

[45] *Id.* at ¶¶ 6.b., 7.f.

[46] *Id.* ¶ 6 ("[E]xcept as provided in Paragraphs 7 & 9, Ludvik . . . discharge[s] Salt Lake City] and HDJV . . . from any and all disputes, claims, [and] damages of any kind whatsoever related to or concerning the Project, HDJV-Ludvik Subcontract, the Vanderlande-Ludvik Subcontract, the Ludvik Claims [against HDJV], and/or [Ludvik's] Pass-Through Claim."); *id.* ¶ 7 ("The Parties agree that the following items have not been settled or released, and are expressly excluded from this Settlement and Release Agreement: . . . (c) any change order work that has not yet been approved by HDJV and/or [Salt Lake City]; . . . [and] (f) Any and all claims Ludvik has or may have against Vanderlande."); *id.* ¶ 9 ("In the event that Vanderlande asserts a pass-through claim arising from or related to Ludvik's work, then Ludvik agrees to indemnify, defend, and hold harmless HDJV and [Salt Lake City] from any such pass-through claim, including losses, damages, and expenses.").

On March 8, 2021, Vanderlande settled with HDJV and Salt Lake City for $5.4 million.[47] In exchange, Vanderlande released HDJV from all claims related to the Vanderlande-Ludvik subcontract and Ludvik's pass-through claims.[48] Following the Vanderlande-HDJV settlement, Vanderlande signed the final change order—Change Order 40—on March 22, 2021.[49]

Ludvik commenced this suit in July 2021,[50] alleging fraud, negligent misrepresentation, fraudulent non-disclosure, breach of contract, and breach of good faith and fair dealing.[51] The court dismissed both the fraud claim and the fraudulent non-disclosure claim pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.[52] Vanderlande now moves for partial summary judgment on the negligent misrepresentation claim and the portions of the breach of contract claim and breach of good faith and fair dealing claim related to Ludvik's pass-through claims against HDJV.[53] Ludvik filed its opposition on June 2, 2023,[54] and Vanderlande filed its reply on July 14, 2023.[55]

## STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[56] "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the

---

[47] Settlement and Release Agreement ("Vanderlande-HDJV Settlement") ¶ 4, ECF No. 79-1.
[48] *Id.* ¶ 5.b.
[49] Change Order 40, ECF No. 73-15.
[50] *See* Compl. and Jury Demand, ECF No. 2.
[51] *See* Am. Compl. ¶¶ 49–87.
[52] Order Granting in Part and Denying in Part [36] Mot. to Dismiss (Partial), ECF No. 47; Transcript of Proceedings 6–11, ECF No. 49.
[53] Def.'s Mot.
[54] Pl.'s Opp'n to Mot. for Summ. J. (Partial) ("Pl.'s Opp'n"), ECF No. 73.
[55] Def.'s Reply in Support of Mot. for Summ. J. (Partial) ("Def.'s Reply"), ECF No. 77.
[56] Fed. R. Civ. P. 56(a).

evidence presented."[57] "'All disputed facts must be resolved in favor of the party resisting summary judgment.'"[58] However, "if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue."[59]

## DISCUSSION

### I.  Relationship of 30(b)(6) Deponent Testimony to Parties' Legal Claims and Theories

At several points in its Motion, Vanderlande argues or implies that Ludvik is bound to pursue certain factual theories to prove its claims because Ludvik's corporate witness under Rule 30(b)(6) testified that Ludvik's legal claims were based on certain factual theories.[60] This argument is without merit.

While Rule 56 is meant to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial,"[61] Vanderlande's theory takes Rule 56 a step too far. The Tenth Circuit has held—in a different, but informative, factual context—that the deposition "testimony of a 30(b)(6) witness is merely an evidentiary admission, rather than a judicial admission."[62] Simply put, deposition testimony is evidence, but it does not bind parties on their theory of a legal claim or defense.

---

[57] *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).

[58] *White v. Gen. Motors Corp.*, 908 F.2d 669, 670 (10th Cir. 1990).

[59] *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (quoting *Patel v. Hall*, 849 F.3d 970, 978 (10th Cir. 2017)).

[60] *See* Def.'s Mot. 7–8, 15, 16–17, 18, 19, 20, 27, 32. Most directly, Vanderlande asserts that "[t]he testimony of Ludvik's corporate representative is binding on Ludvik, and so Ludvik should not be able to rely on [factual theories for claims not mentioned by the corporate representative]." *Id.* at 8.

[61] Fed. R. Civ. P. 56 advisory committee notes to subdivision (e) to the 1963 amendment.

[62] *Vehicle Mkt. Rsch., Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1261 (10th Cir. 2016) (holding that the trial court did not abuse its discretion in removing from a jury instruction a sentence suggesting that 30(b)(6) testimony may not be explained at trial). A "judicial admission" is "[a] formal waiver of proof that relieves an opposing party from having to prove the admitted fact and bars the party who made the admission from disputing it." Admission, Black's Law Dictionary (11th ed. 2019).

Other courts have considered this issue a handful of times and have ruled that while "[a] plaintiff may testify in a manner that dooms his claim on the merits, . . . unfavorable deposition testimony does not amend the complaint."[63] For example, in *Stepp v. Covance Central Laboratory Services*, when an employee alleging employment discrimination testified at his deposition that he could not recall instances of retaliation other than specified mistreatment, the Seventh Circuit held that the employee did not waive other instances pled in his complaint that formed the basis for his failure-to-promote claim.[64] The same is true here.

While Ludvik's 30(b)(6) representative—Mr. Jim Ludvik—testified regarding Ludvik's factual theories for each of Ludvik's claims, that testimony does not categorically foreclose Ludvik from pursuing any other factual theory so long as the theory is supported by the evidence.

Next, Vanderlande points to comments by Ludvik's counsel at the 30(b)(6) deposition in an attempt to limit what factual theories Ludvik may pursue on its negligent misrepresentation claim.[65] Again, comments during a deposition cannot bar Ludvik from pursuing certain factual theories. Further, this comment was hearsay outside any exception.[66]

Having resolved these preliminary issues, the court turns to the numerous issues related to Ludvik's negligent misrepresentation claim.

## II.   Negligent Misrepresentation Claim

In order to prevail on a claim for negligent misrepresentation under Utah law,[67] Ludvik must show: (1) Vanderlande made a "'careless or negligent misrepresentation of a material

---

[63] *Step v. Covance Cent. Lab'y Servs., Inc.*, 931 F.3d 632, 634 (7th Cir. 2019); *accord Foster v. DeJoy*, 817 Fed. Appx. 270, 272 (7th Cir. 2020); *Magnum v. U.S. Steel Corp.*, 3:20-cv-540, 2022 WL 824320, *13 (S.D. Ill., Mar. 18, 2022); *Smith v. Cipolla*, 21-cv-1387, 2023 WL 2646718 (N.D. Ill., Mar. 27, 2023).
[64] *Step*, 931 F.3d at 634.
[65] Def.'s Mot. 15.
[66] *See* Fed. R. Evid. 801, 802; *cf. id.* 801(d)(2), 804(b)(1).
[67] This court has already ruled that, pursuant to the parties' contract, Utah law controls all claims. *See* Transcript of Proceedings at 4.

fact,'" which may be an affirmative statement or a material omission where a duty to disclose

exists; (2) Ludvik "reasonably relied" on Vanderlande's misrepresentation; (3) Vanderlande

"had a pecuniary interest in the transaction"; (4) Vanderlande "was in a superior position to

know the material facts"; and (5) Vanderlande "should have reasonably foreseen" that Ludvik

"was likely to rely upon the misrepresentation."[68]

     Vanderlande first attempts to limit the evidence on which Ludvik can rely in

establishing its claim by invoking the Utah Uniform Mediation Act.[69] Second, Vanderlande

argues that Ludvik's claim is barred by Utah's economic loss rule.[70] Third, Vanderlande

makes several arguments to show that Ludvik either lacks sufficient evidence on the first and

second elements, or cannot succeed on those elements as a matter of law.[71] And finally,

Vanderlande argues that portions of the Settlement Agreement bar Ludvik's claim.[72] The

court addresses each in turn.

### A.  The Utah Uniform Mediation Act

     Vanderlande argues that evidence arising out of the parties' mediation is privileged

under the Utah Uniform Mediation Act. According to Vanderlande, this includes statements

---

[68] *Andersen v. Homecomings Fin., LLC*, No. 2:11-cv-000332-TS, 2011 WL 3626828 (D. Utah 2011) (quoting *Mitchell v. Smith*, No. 1:08-cv-103-TS, 2010 WL 5172906, at *8 (D. Utah 2010); *Sugarhouse Fin. Co v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980) ("Misrepresentation may be made either by affirmative statement or by material omission, where there exists a duty to speak."); *see also Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986) ("Utah long ago acknowledged the tort of negligent misrepresentation, which provides that a party injured by reasonable reliance upon a second party's carelessness or negligent misrepresentation of a material fact may recover damages from that injury when the second party had a pecuniary interest in the transaction, was in a superior position to know the material facts, and should have reasonably foreseen that the injured party was likely to rely upon the fact."); Model Utah Jury Instructions, Second Edition, Utah Courts (July 10, 2023), https://legacy.utcourts.gov/muji/ [https://perma.cc/E2W5-36ES] (select "Civil" from the first dropdown menu, then select "1800 – Fraud and Negligent Misrepresentation" from the second dropdown menu, then scroll to "CV 1802 Elements of negligent misrepresentation").
[69] Def.'s Mot. 16–17.
[70] *Id.* at 17–18.
[71] *Id.* at 20–27.
[72] *Id.* at 19–20.

"made between June 12, 2020 (*i.e.*, the date of the parties' mediation) and August 24, 2020 (*i.e.*, the date the Settlement Agreement arising out of that mediation was executed)."[73]

The Utah Uniform Mediation Act establishes that a "mediation communication" is "not subject to discovery or admissible in evidence in a proceeding unless waived."[74] This court previously held that the Utah Uniform Mediation Act applies in this case, and that it operates to exclude at least some of the allegations contained in Ludvik's Amended Complaint—specifically, those contained in paragraphs 20 through 25.[75] Vanderlande seeks to extend this ruling to statements that occurred after the mediation, but which are allegedly related to it. Namely—without citation to supporting caselaw—Vanderlande seeks to exclude any statement that occurred after the mediation and before the signing of the formal Settlement Agreement. The statute simply does not support this argument.

Under the statute, a "mediation communication" is "conduct or a statement . . . that occurs *during* a mediation or is made for the *purposes* of considering, conducting, participating in, initiating, continuing, or reconvening a mediation or retaining a mediator."[76] A "mediation" is defined as "a process in which a mediator facilitates communication and negotiation between parties to assist them in reaching a voluntary agreement regarding their dispute."[77] Vanderlande identifies nothing to suggest that the parties retained their mediator from June 12 until August 24, 2020. Thus, the parties' mediation concluded on June 12 and any conduct or statements occurring *after* June 12 could not be said to be "*during*" the

---

[73] *Id.* at 17.
[74] Utah Code § 78B-10-104(1).
[75] Transcript of Proceedings at 4–6. Ludvik invites the court to reconsider its prior ruling on this issue, presumably under Rule 54 of the Federal Rules of Civil Procedure, and suggests that Vanderlande has waived the privilege protected by the Act. However, waiver under the Act requires an express waiver by all parties to the mediation. *See* Utah Code § 78B-10-105(1). The court will not use its discretion to reconsider this issue absent a significant showing of cause by Ludvik, especially, where, as here, there does not appear to be an express waiver of the privilege.
[76] Utah Code § 78B-10-102(2) (emphasis added).
[77] *Id.* § 78B-10-102(1).

mediation. Further, Vanderlande fails to show how any communications exchanged between June 12 and August 24 could be said to be for any of the prohibited purposes listed in the statute; instead, they were for the purpose of finalizing the Settlement Agreement.

Finally, to the extent that Vanderlande argues that either the MOU or the Settlement Agreement itself is a "mediation communication" that is privileged under the statute, that argument is foreclosed by the statute itself. The Act expressly provides an exception for "an agreement evidenced by a record signed by all parties to the agreement,"[78] which would cover both the MOU and the Settlement Agreement.

As this court ruled previously, the Utah Uniform Mediation Act does protect the communications that occurred between the parties in the lead-up to the Atlanta mediation that were for the purposes of the mediation and for communications during the Atlanta mediation itself.[79] But communications occurring after the mediation itself are not privileged under the Act.

### B.  Utah's Economic Loss Rule

Vanderlande argues, and Ludvik agrees, that Ludvik's negligent misrepresentation claim is barred "to the extent" that it overlaps with duties imposed by the parties' Settlement Agreement.[80]

Utah's economic loss rule "prevents recovery of economic damages under a theory of . . . tort when a contract covers the subject matter of the dispute" and makes "the contract . . . the exclusive means of obtaining economic recovery."[81] However, "[w]hether the economic loss rule applies depends on 'whether a duty exists independent of any contractual obligations

---

[78] *Id.* § 78B-10-106.
[79] Transcript of Proceedings at 4–6.
[80] Def.'s Mot. 18; Pl.'s Opp'n. 25.
[81] *Reighard v. Yates*, 2012 UT 45, ¶ 20, 285 P.3d 1168, 1176.

between the parties.'" [82] "When an independent duty exists, the economic loss rule does not bar a tort claim 'because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.'" [83] Several Utah cases have applied the economic loss rule to negligent misrepresentation claims and have come out both ways, depending on whether the parties' contract provided for the same remedy as the alleged tort claim. [84]

Two cases from the Utah Supreme Court are instructive. In *Reighard v. Yates*, homebuyers sued on several tort theories, including negligent misrepresentation, after finding mold in the home they purchased. [85] The Utah Supreme Court held that the tort claims were barred by the economic loss rule, since the home-sale contract included several provisions providing for seller disclosures and warranties and there was a direct overlap in duties under tort and contract. [86]

More recently, in *HealthBanc International v. Synergy Worldwide*, the Utah Supreme Court held that a tort claim for fraudulent inducement was barred by the economic loss rule. [87] There, HealthBanc had licensed a formula for a nutritional supplement to Synergy, and eventually sued Synergy for breach of contract for failing to pay required royalties. [88] Synergy counterclaimed for fraudulent inducement, alleging that HealthBanc had misrepresented its

---

[82] *Id.* at ¶ 21 (quoting *Hermansen v. Tasulis*, 2002 UT 52, ¶ 17, 48 P.3d 235).

[83] *Hermansen*, 2002 UT 52, at ¶ 17 (quoting *Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256 (Colo. 2000)).

[84] *See, e.g., Reighard*, 2012 UT 45, at ¶¶ 19–26 (holding that the economic loss rule barred recovery for a negligent misrepresentation claim and a nuisance claim when the claims alleged duties that overlapped with seller disclosures and warranties in a home-sale contract); *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶¶ 34–40, 221 P.3d 234 (holding that the economic loss rule did not bar recovery for a negligent misrepresentation claim brought by a homeowners association that was initially owned by the developer against the developer, since the developer owed a limited fiduciary duty); *KTM Health Care Inc. v. SG Nursing Home LLC*, 2018 UT App 152, 436 P.3d 151.

[85] *Yates*, 2012 UT 45, ¶¶ 4–6.

[86] *Id.* at ¶¶ 24–26.

[87] 2018 UT 61, ¶ 1, 435 P.3d 193. The court finds this case persuasive since negligent misrepresentation closely parallels fraudulent inducement. *See, e.g., Anderson v. Kriser*, 2011 UT 66, ¶ 25, 266 P.3d 819; *Christenson v. Commonwealth Land Title Ins. Co.*, 666 P.2d 302, 305 (Utah 1983).

[88] *Healthbanc*, 2018 UT 61, at ¶¶ 2–3.

ownership rights in the licensed formula,[89] despite a contract provision that contained an express warranty provision in which HealthBanc warranted that it was the sole owner of the formula.[90] The Utah Supreme Court held that because Synergy's "fraudulent inducement claim . . . overlaps completely with a contract claim—in the sense that the alleged fraudulent inducement is also a breach of a warranty in the contract"—the economic loss rule barred the fraudulent inducement claim.[91] Importantly, the court also rejected Synergy's argument that simply because inducement occurs prior to the execution of a contract, it falls outside the scope of the contract.[92]

At the outset, Ludvik's efforts to establish that conduct occurring during the lead-up to the Settlement Agreement is categorically beyond the scope of the contract[93] are unpersuasive. Indeed, the *Healthbanc* court expressly rejected this argument.[94] Instead, per the framework discussed above, the inquiry is whether Vanderlande's contractual duties overlapped with the duty alleged in the negligent misrepresentation claim. Vanderlande's argument on this point can be boiled down to the following: *Any* alleged misrepresentation that occurred inside the Settlement Agreement must be a breach of a contractual duty, and therefore cannot be actionable in tort.[95] This argument fails.

Unlike in *Healthbanc* and *Reighard*, the contract at issue does not contain any warranty provisions imposing a duty on Vanderlande that could be interpreted to overlap with the duties it owes in tort. Indeed, as Vanderlande itself points out, Ludvik, not Vanderlande,

---

[89] *Id.* at ¶ 4.
[90] *Id.* at ¶ 2
[91] *Id.* at ¶¶ 9, 12–16.
[92] *Id.* at ¶¶ 17–19.
[93] *See* Pl.'s Opp'n. 22–23.
[94] *HealthBanc*, 2018 UT 61, at ¶ 17–19.
[95] Def.'s Mot. 18.

warranted that the pass-through claims remained viable and had merit.[96] Instead, the statements Ludvik relies upon to establish its claim imply but do not warrant that Vanderlande believed the claims to remain viable. For instance, the Settlement Agreement provides: "Vanderlande agrees to take reasonable steps necessary to support the [Ludvik] Pass-Through Claims against HDJV."[97] Further, Vanderlande agreed to remain liable on the pass-through claims "when, and to the extent [Vanderlande] receives payment from HDJV."[98] Unlike the plaintiffs in *Healthbanc* and *Reighard*, Ludvik could not make out a claim for breach of contract on these provisions for Vanderlande failing to disclose that it knew that HDJV had time barred Ludvik's pass-through claims. Rather, Vanderlande would only breach its contract if it failed to take "reasonable steps" to aid Ludvik, or if it received a payout from HDJV on Ludvik's claims while withholding the money; these hypothetical contractual breaches are completely unrelated to the breach of duty found in tort.

In sum, the duty alleged to be owed by Vanderlande for Ludvik's negligent misrepresentation claim is an independent duty of care that was not contemplated by their contract. And thus, no part of Ludvik's negligent misrepresentation claim is barred by the economic loss rule.

### C. Elements of Negligent Misrepresentation

Vanderlande makes several arguments to show that Ludvik cannot, as a matter of law, prove the elements of negligent misrepresentation based on an omission: (1) Vanderlande did not make a misrepresentation in the Settlement Agreement itself; (2) Vanderlande did not owe

---

[96] Def.'s Mot. 20.
[97] Ludvik-Vanderlande Settlement ¶ 3.a.
[98] *Id.* at ¶ 5.a.(1).

a duty to disclose to Ludvik; (3) Vanderlande did not breach its duty to disclose; and (4) Ludvik did not reasonably rely on any omission.[99] The court considers each in order.

### 1. Misrepresentations in the Settlement Agreement Itself

Vanderlande argues that nothing in the Settlement Agreement suggests that Vanderlande expressly or impliedly warranted the viability of the pass-through claims.[100] Instead, Vanderlande argues that the Settlement Agreement clearly states that Vanderlande "shall have no liability to" Ludvik for the pass-through claims if "after presentation and full prosecution" of the claims HDJV does not grant them.[101] According to Vanderlande, this language means that the Settlement Agreement does not contain any misrepresentations, since it expressly contemplates that Ludvik may not have a viable pass-through claim against HDJV. Vanderlande's argument on this point mistakes a contractual warranty for the tort of negligent misrepresentation.

The undisputed facts show that in the Settlement Agreement, Vanderlande made certain promises regarding the pass-through claims. Namely, it agreed to "take reasonable steps necessary to support" the pass-through claims and to "cooperate and participate" in developing the pass-through claims and providing them to HDJV.[102] The Agreement also states that Vanderlande "shall have no liability" to Ludvik on the pass-through claims if HDJV does not grant them.[103] It is immaterial whether Vanderlande expressly represented the viability of the pass-through claims, since these promises imply that Ludvik's pass-through claims *could be* viable, if only they were fully developed and presented in accordance with contractual requirements. Further, the express waiver of liability if HDJV rejects the claims

---

[99] Def.'s Mot. 19–25.
[100] *Id.* at 19–20.
[101] Ludvik-Vanderlande Settlement ¶ 5.a.
[102] *Id.* ¶¶ 3.a., 6.
[103] *Id.* at ¶ 5.a.

16

does nothing to change the overall impression in the Settlement Agreement that Ludvik's

claims have a chance at succeeding.

A reasonable jury could find that a misrepresentation of material fact occurred here.

Thus, Vanderlande has not carried its burden to show that it is entitled to judgment as a matter

of law.

### 2. Duty to Disclose

Under Utah law, "[o]rdinarily to prevail in an action for negligent misrepresentation,

plaintiffs must identify a 'representor [who] makes an affirmative assertion which is false.'"[104]

However, "an omission may be actionable as a negligent misrepresentation where the

defendant has a duty to disclose."[105] Vanderlande argues that as a matter of law, it did not owe

Ludvik a duty to disclose.[106]

Where an omission is the alleged misrepresentation, "a duty to disclose is a necessary

element of the tort of negligent misrepresentation."[107] Whether a duty exists is a pure question

of law[108] and is ultimately determined by weighing various policy considerations and the legal

relationship between the parties.[109] Generally, "[a] person who possesses important, even

vital, information of interest to another has no legal duty to communicate the information

---

[104] *Smith v. Frandsen*, 2004 UT 55, ¶ 10, 94 P.3d 919.

[105] *Id.* at ¶ 11.

[106] Def.'s Mot. 23–25.

[107] *Frandsen*, 2004 UT 55, ¶ 11.

[108] *Id.* ¶ 14. Notably, on the question of duty, the court relies on cases interpreting the elements of both negligent misrepresentation and fraudulent nondisclosure, since the duty to disclose element is identical. *See, e.g.*, *Anderson v. Kriser*, 2011 UT 66, ¶ 25, 266 P.3d 819 (noting that the "essential difference" between the two claims "is the mental state of the defendant that the plaintiff must establish in order to prevail"); *Christenson*, 666 P.2d at 305 ("Negligent misrepresentation is a tort which grew out of common-law fraud.").

[109] *Smith*, 2004 UT 55, ¶ 15; *DeBry v. Valley Mortg. Co.*, 835 P.2d 1000, 1003–04 (Utah App. 1992); *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶¶ 15–16, 143 P.3d 283 ("A relationship that is highly attenuated is less likely to be accompanied by a duty than one, for example, in which parties are in privity of contract. Age, knowledge, influence, bargaining power, sophistication, and cognitive ability are but the more prominent among a multitude of life circumstances that a court may consider in analyzing whether a legal duty is owed by one party to another. Where a disparity in one or more of these circumstances distorts the balance between the parties in a relationship to the degree that one party is exposed to an unreasonable risk, the law may intervene by creating a duty on the advantaged party to conduct itself in a manner that does not reward exploitation of its advantage.").

where no relationship between the parties exists."[110] Vanderlande emphasizes[111] the rule that

"a duty [to disclose] will not be found where the parties deal at arm's length, and where the

underlying facts are reasonably within the knowledge of both parties."[112] Indeed, "[u]nder

such circumstances, the plaintiff is obliged to take reasonable steps to inform himself, and to

protect his own interests."[113] However, the Utah Supreme Court has been clear that a duty to

disclose may arise "where a party negotiating for a contract is cognizant of facts of which the

other party is presumed ignorant and for the disclosure of which one party must rely upon the

other party to enable it to form a judgment as to the expediency of entering into the contract

on the terms proposed."[114] It is in part because of this disparity in access to information that

sellers of property owe a duty to disclose.[115] Likewise, "where a [party to a contract] makes an

affirmative statement, that person has a common-law duty to disclose all material facts

necessary to prevent that statement from being misleading."[116]

These latter rules control this case. To begin with, at the time they entered the

Settlement Agreement, the parties were not in an arm's length relationship.[117] Vanderlande

---

[110] *Yazd*, 2006 UT 47, ¶ 17.

[111] Def.'s Mot. 24.

[112] *Sugarhouse Finance Co.* 610 P.2d at 1373.

[113] *Id.*

[114] *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1330 (Utah 1990) (discussing the duties owed for nondisclosure in the context of a fraudulent nondisclosure claim); *see also Ong Intern. (U.S.A.) Inc. v. 11th Ave Corp.*, 850 P.2d 447, 454 (Utah 1993) ("A fiduciary duty can exist where one party has decidedly greater access to information than the other."). Likewise, as the Restatement of Torts puts it, "[o]ne party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated, . . . matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and . . . facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect disclosure of those facts." Restatement (Second) of Torts § 551(2) (Am. L. Inst. 1965); *see also Dugan v. Jones*, 615 P.2d 1239, 1249 (Utah 1980) (relying on the Restatement in formulating negligent misrepresentation).

[115] *See, e.g.*, *Yazd*, 2006 UT 47, ¶ 24.

[116] *Shree Ganesh, LLC v. Weston Logan, Inc.*, 2021 UT 21, ¶ 37, 491 P.3d 885; *see also* 17 Am. Jur. 2d Fraud and Deceit § 203 (2023 Update) ("[A] duty to disclose may exist where one voluntarily undertakes to speak but fails to prevent his or her words from being misleading or conveys only partial information.").

[117] *See* Arm's Length, Black's Law Dictionary (11th ed. 2019).

had undertaken to assist Ludvik in prosecuting its claim against HDJV, and thereby had incurred obligations to communicate candidly with Ludvik about the viability of its claim. Under the ISA, Vanderlande acted as an intermediary for Ludvik's claims against HDJV and was put in a position to have superior communication with and information from HDJV related to Ludvik's pass-through claims than did Ludvik.[118] Indeed, the undisputed facts show that it was Vanderlande, not Ludvik, that was in direct communication with HDJV about Ludvik's pass-through claims.[119] Therefore, Ludvik was in a position where it had to rely upon Vanderlande for information from HDJV about the viability of its claims, from HDJV's perspective.

The parties then entered into a subsequent contract—the Settlement Agreement—that covered the topic of the pass-through claims in detail.[120] Specifically, the Settlement Agreement contained numerous representations on the part of Vanderlande that suggested that Vanderlande believed that the pass-through claims remained potentially viable.[121] At the time it made these statements, Vanderlande should have known that Ludvik had a false impression as to the validity of its claims—indeed, Ludvik even warranted it "reasonably believe[ed] the claims were valid."[122] In other words, at the time the parties negotiated for the Settlement Agreement, Ludvik was forced to rely on Vanderlande to communicate information related to the validity of its pass-through claims, and facts known by Vanderlande were necessary for Ludvik to form a judgment as to whether to enter the contract on the given terms. Further, the

---

[118] *See* ISA ¶¶ 9.2.2, 11.2.
[119] *See, e.g.*, Oct. 1 Letter (HDJV notifying Vanderlande of its resolution of Ludvik's claims); Oct. 7 Letter (Vanderlande notifying Ludvik of HDJV's reasons for denial of Ludvik's claims); Dec. 18 Email (Ludvik noting that Vanderlande provided HDJV's denial letter to Ludvik two months after receiving it).
[120] *See* Ludvik-Vanderlande Settlement ¶¶ 3, 5.a.1, 5.a.2, 5.b, 6, 7.
[121] *Id.*
[122] *Id.* at ¶ 10.

19

statements Vanderlande made prior to the parties' mediation[123] and the promises it made in the Settlement Agreement regarding the pass-through claims could themselves be viewed as misleading,[124] thus creating a duty to disclose information necessary to correct the misapprehension.[125]

Therefore, given the particular relationship at issue in this case and the fact that a jury could find that Vanderlande made misrepresentations that it owed a duty to correct, Vanderlande has not met its burden to show that, as a matter of law, it did not owe a duty to disclose information related to the validity of Ludvik's pass-through claims when it entered into a Settlement Agreement largely premised on the potential validity of Ludvik's pass-through claims. The court turns next to whether Vanderlande breached this duty.

### 3. Breach of a Duty to Disclose

"After it has been determined that a duty [to disclose] exists as a matter of law, the trier of fact resolves the question as to whether the duty was breached in the particular case."[126] Thus, on a motion for summary judgment, Vanderlande can succeed only if the undisputed facts show that no reasonable jury could find that Vanderlande breached its duty.[127] Vanderlande argues that because it supplied Ludvik with the October 1 letter from

---

[123] As discussed, Vanderlande continued to behave as though the only problem with Ludvik's pass-through claims was documentation, even after receiving the October 1 letter from HDJV. *See* January 15, 2020 Email from Alewelt to Reinstein 2 ("Because Ludvik failed to comply with the contractual requirements, including presenting a valid claim supported by appropriate documentation, Vanderlande and HDJV advised that the delays and acceleration claimed by Ludvik is unjustified and was rejected. If Ludvik has any of the requested supporting information or documentation, then Ludvik should forward that to Vanderlande immediately.").

[124] *See* Ludvik-Vanderlande Settlement ¶¶ 3, 6, 7.

[125] *See Shree Ganesh*, 2021 UT 21, ¶ 37.

[126] *First Sec. Bank of Utah*, 786 P.2d at 1329.

[127] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (analogizing summary judgment under Rule 56 to a directed verdict under Rule 50, and noting that "[i]f reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed."); *see also* 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2729 (4th ed., April 2023 Update) (noting that in the context of negligence actions, "even when there is no dispute as to the facts, it is usually for the jury to decide whether the conduct in question meets the reasonable-person standard.").

HDJV, it satisfied its duty to disclose.[128] Ludvik counters that while Vanderlande did provide the HDJV letter, Vanderlande continued to behave as if Ludvik's pass-through claims had not been time barred, and thus, the jury should decide whether a breach occurred.[129] The court agrees with Ludvik.

In the context of negligent misrepresentation, a breach of the duty to disclose occurs when the defendant "should have known" of the information[130] and the information is not adequately disclosed.[131] *Shree Ganesh, LLC v. Weston Logan, Inc.* is somewhat analogous. There, during contract negotiations for the purchase of a hotel, Shree Ganesh sought a price reduction on the property, given that it had information that three new hotels would enter the area and cause a reduction in value.[132] In response to this query, Weston Logan's real estate agent replied by attaching a report, and stating "that there was not a 'single property, not even in the preplanning stage'" coming to the area.[133] This statement was technically true, but nonetheless, the Utah Supreme Court held that a jury question existed about "whether Weston Logan breached its duty to clarify a potentially misleading and material statement."[134]

Here, the undisputed facts show that Vanderlande supplied Ludvik with HDJV's letter supplying the reasons it denied Ludvik's pass-through claims in December of 2019, prior to the parties' settlement.[135] However, the undisputed facts also show that Vanderlande continued to behave as if Ludvik's claims could be submitted to HDJV, without referencing or referring to HDJV's position that the claims were time barred; Vanderlande continuously re-

---

[128] Def.'s Mot. 21–22.
[129] Pl.'s Opp'n. 27.
[130] *Kriser*, 2011 UT 66, ¶ 25.
[131] For instance, "constructive notice" is insufficient to comply with a duty to disclose. *See Christenson*, 666 P.2d at 307; *Marcantel v. Michael & Sonja Saltman Fam. Tr.*, 993 F.3d 1212, 1228–31 (10th Cir. 2021).
[132] 2021 UT 21, ¶¶ 2–6, 491 P.3d 885.
[133] *Id.* at ¶ 6.
[134] *Id.* at ¶ 39.
[135] *See* Ludvik 30(b)(6) Dep. 43:17–43:23, ECF No. 65-4; Dec. 18 Email 1; *see also* Def.'s Mot. 11–12; Pl.'s Opp'n. 10–12.

asserted that Ludvik's claims should comply with contractual requirements for form and substance. Namely, on January 15, 2020, Vanderlande replied to Ludvik's December 18, 2019 letter.[136] In this reply, Vanderlande does not make any mention of HDJV's position regarding the timeliness of Ludvik's claims; rather, it asserts that Ludvik's claim failed because it did not contain the necessary information.[137] It concludes that Ludvik should forward "any of the requested supporting information or documentation" to Vanderlande and that Vanderlande is "open to meeting to resolve all open matters."[138] And, as discussed earlier, Vanderlande's actions regarding the Settlement Agreement imply that the pass-through claims remained viable.[139] On these facts, a reasonable jury could find that Vanderlande breached its duty to disclose.

Finally, the facts also could suggest that Vanderlande did in fact reasonably believe that the pass-through claims remained open.[140] Namely, when signing Change Order 22, Vanderlande conferred with HDJV's project manager, and was told that signing Change Order 22 "will not close the door on [Ludvik's] potential claim."[141] Further, unrebutted evidence shows that Vanderlande did in fact re-submit Ludvik's claim to HDJV on September 18, 2020, and provided analysis on the claim at HDJV's request,[142] which could suggest that Vanderlande believed that HDJV might accept Ludvik's pass-through claim if it were submitted with proper supporting information. In other words, a reasonable jury could find that Vanderlande was not careless or negligent in failing to disclose anything more than what it did disclose.

---

[136] Jan. 15 Letter.
[137] *Id.* at 2.
[138] *Id.* at 3.
[139] *See* Ludvik-Vanderlande Settlement ¶¶ 3.a., 6.b., 10.
[140] *See* Def.'s Mot. 21.
[141] ECF 65-8.
[142] Nov. 5, 2020 Letter from Alewelt to Tyler 1.

Thus, summary judgment on the issue of whether Vanderlande could be liable for a negligent misrepresentation based on an omission is not appropriate, since a reasonable jury could find a breach of the duty to disclose.

### 4.   Reasonable Reliance on Omissions or Misrepresentations

In order to establish negligent misrepresentation, Ludvik must show reasonable reliance on the alleged omissions or misrepresentations.[143] "While the question of reasonable reliance is usually a matter within the province of the jury, there are instances where courts may conclude that as a matter of law, there was no reasonable reliance."[144] Indeed, "plaintiffs may accept representations without investigation unless "facts should make it apparent that they are being deceived."[145]

Several Utah cases are illustrative. In *Gold Standard, Inc. v. Getty Oil Co.*, the Utah Supreme Court held that, as a matter of law, reliance was unreasonable.[146] There, Gold Standard alleged that Getty made a fraudulent promise at a meeting between the two entities.[147] However, the undisputed facts showed that Getty sent Gold Standard several follow-up letters to clarify the situation.[148] The Utah Supreme Court concluded that these numerous follow-up communications rendered any reliance on the alleged fraud unreasonable as a matter of law.[149]

---

[143] *See Price-Orem Inv. Co.*, 713 P.2d at 59; *McBroom v. Child*, 2016 UT 38, ¶ 20, 392 P.3d 835.
[144] *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1067 (Utah 1996) (citations omitted) (citing *Berkeley Bank for Coops. v. Meibos*, 607 P.2d 798, 801 (Utah 1980)).
[145] *Donner v. Nicklaus*, 778 F.3d 857, 870 (10th Cir. 2015) (cleaned up) (quoting *Robinson v. Tripco Inv., Inc.*, 21 P.3d 219, 225 (Utah Ct. App. 2000)).
[146] 915 P.2d 1060, 1066–69 (Utah 1996).
[147] *Id.* at 1066.
[148] *Id.* at 1067.
[149] *Id.*; *see also* Mikkelson v. Quail Valley Realty, 641 P.2d 124, 126 (Utah 1982) ("While plaintiff may have initially received false information, he cannot reasonable continue to rely on it once true and corrected information is furnished to him . . . .").

On the other end of the spectrum is *Christenson v. Commonwealth Land Title Insurance Company*.[150] There, Cape Trust was a trust for the employees of Capitol Thrift & Loan, and Commonwealth acted as an escrow agent for AGLA.[151] AGLA owned a development project, and had secured a loan from Capitol Thrift by assigning a beneficial interest in several of the lots to Capitol Thrift, and those lots were subsequently paid off.[152] Afterwards, AGLA assigned to *Cape Trust* a beneficial interest in the same lots.[153] As part of this transaction, Commonwealth sent AGLA a letter informing it of the lots in which AGLA retained an interest, which erroneously listed the lots that had previously been assigned to Capitol Thrift and whose interest had been paid off, and AGLA forwarded this letter to Cape Trust.[154] While a trustee for Cape Trust who also had a role with Capitol Thrift had likely seen the check to Capitol Thrift that was evidence that the lots at issue had been paid off, the court nonetheless held that reliance on Commonwealth's letter was reasonable.[155] The court reasoned that the check was part of a different transaction, was received six months prior to the alleged negligent misrepresentation, and "it was unreasonable to expect that [Cape Trust's agent] would either remember the check or go back to old Capitol Thrift files and search for a check that might be related to the transaction."[156]

First, Vanderlande argues that Ludvik cannot succeed on its negligent misrepresentation claim "[t]o the extent Ludvik bases its 'negligent misrepresentation' claim upon an alleged 'omission' regarding the Change Order Log,"[157] since Ludvik did not rely on

---

[150] 666 P.2d 302 (Utah 1983).
[151] *Id.* at 303.
[152] *Id.* at 304.
[153] *Id.*
[154] *Id.*
[155] *Id.* at 306–07.
[156] *Id.* at 307.
[157] Def.'s Mot. 22.

the Change Order Log in executing the Settlement Agreement. Vanderlande premises this argument on 30(b)(6) deposition testimony from Ludvik that suggests that Ludvik's corporate representative never *personally* reviewed the change orders that omitted Ludvik's claim, and that the corporate representative did not view the Change Order Log as important.[158] Neither statement would preclude this court from finding that a genuine dispute of material fact existed as to whether Ludvik relied upon Vanderlande's omissions or misrepresentations. The former statement is inapposite, as it only suggests that the corporate representative himself did not review the change orders. The latter statement misconstrues the deposition. Ludvik's corporate representative responded "no" in response to the question whether "it was important for you to know *in deciding whether or not to pursue HDJV directly* as to whether your claim was on the change order logs."[159] The corporate representative correctly pointed out that Ludvik never could pursue HDJV directly because it didn't have privity with HDJV.[160] Thus, this response does not shed any light on whether Ludvik viewed the change order logs as important or unimportant.

Second, Vanderlande argues that it should be granted summary judgment because it did disclose to Ludvik the October 1, 2019 letter from HDJV.[161] The undisputed facts show that Vanderlande did in fact provide Ludvik with this letter, on or about December 12, 2019.[162] That letter included two references to HDJV considering Ludvik's claim to be time barred: the first in paragraph 2.d., and the second in paragraph 6.[163] There were communications subsequent to Ludvik's receipt of the October 1 letter that could lead Ludvik

---

[158] Def.'s Mot. 22–23; *see also* Ludvik 30(b)(6) Dep. 32:18–33:6.
[159] Ludvik 30(b)(6) Dep. 79:11–79:17.
[160] *Id.*
[161] Def.'s Mot. 24–25.
[162] Dec. 18 Email.
[163] Oct. 1 Letter.

to believe that its pass-through claims remained viable.[164] However, Ludvik's corporate

representative testified that he was unsure whether Ludvik ever requested more information

from Vanderlande related to HDJV's assertion that the pass-through claims were time

barred.[165]

       These facts resemble *Christenson* in that there is a significant length of time between

disclosure of the document alleged to negate reliance and the ultimate misrepresentations.

However, the facts are unlike *Christenson* in that the October 1 letter was much more

important to the parties' relationship than a single check from an entirely different transaction.

But they are also a far cry from the facts of *Gold Standard*, in which an alleged

misrepresentation was expressly negated by subsequent communications. A reasonable jury

could conclude on these facts that Ludvik did reasonably rely on Vanderlande's continued

suggestions that its pass-through claims were not categorically foreclosed by HDJV. Likewise,

a reasonable jury could conclude exactly the opposite. And because reliance is typically a

question for the jury, the court declines to hold as a matter of law that Ludvik's reliance was

unreasonable.

### D.  Effect of Terms of the Settlement Agreement

       Vanderlande makes two final arguments that boil down to whether any portion of the

Settlement Agreement itself precludes Ludvik's negligent misrepresentation claim. Namely, it

argues: (1) the Settlement Agreement's merger clause and non-reliance clause collectively bar

Ludvik's claim; and (2) the Settlement Agreement's mutual releases bar Ludvik's claim.[166]

---

[164] Dec. 18 Email; Jan. 15 Letter; Ludvik-Vanderlande Settlement.
[165] *See* Ludvik 30(b)(6) Dep. 82:11–88:5.
[166] *See* Def.'s Mot. 19–20, 25–27.

### 1.   Merger and Non-Reliance Clauses

Under Utah law, both merger clauses[167] and non-reliance clauses[168] are enforceable

provisions in a contract. A merger clause, however, is simply evidence of complete integration

for purposes of the parole evidence rule;[169] Vanderlande has not cited any Utah cases

suggesting that a merger clause alone prevents introduction of evidence on a separate tort

action.[170] Thus, the parties' merger clause has no bearing on Ludvik's claim.[171]

The question of whether the parties' non-reliance clause precludes Ludvik from

establishing the reliance element of negligent misrepresentation is more complicated. As

discussed above, "[w]hile the question of reasonable reliance is usually a matter within the

province of the jury, there are instances where courts may conclude that as a matter of law,

there was no reasonable reliance."[172] One such instance is when subsequent communications

inform the receiver that reliance on a statement is misplaced.[173] According to Vanderlande,

the non-reliance provision should be one of those instances.

While a non-reliance provision "may not insulate [a party] from liability for its 'own

fraud,'"[174] the Utah Supreme Court has not considered whether a non-reliance clause could

insulate a party from liability for its own negligent misrepresentation.[175] The closest it has

---

[167] *See Tangren Fam. Tr. v. Tangren*, 2008 UT 20, ¶ 13, 182 P.3d 326.
[168] *See Reperex, Inc. v. Coldwell Banker Com.*, 2018 UT 51, ¶ 24, 428 P.3d 1082 (upholding the enforceability of a non-reliance clause when it did not insulate a party to the contract from its own fraud).
[169] *See Tangren*, 2008 UT 20, ¶¶ 11–13.
[170] *Cf. Diversified Holdings, L.C. v. Turner*, 2002 UT 129, ¶¶ 7–8, 63 P.3d 686 (holding that a party's failure to object to a jury instruction waived the argument that a merger clause in a contract precluded another party from suing for fraud and negligent misrepresentation).
[171] *See also Preventative Energy Sols., LLC v. nCap Ventures 5 LLC*, 2017 WL 87028 (D. Utah 2017) (holding a merger clause was not fatal to misrepresentation claims that sought rescission of the contract, since "[i]t is well established that extrinsic evidence is permitted to demonstrate that a contract is invalid.").
[172] *Gold Standard*, 915 P.2d at 1067 (citations omitted) (citing *Berkeley Bank for Coops.*, 607 P.2d at 801).
[173] *Id.* at 1067–68.
[174] *Reperex*, 2018 UT 51, at ¶ 26 (quoting *Lamb v. Bangart*, 525 P.2d 602, 608 (Utah 1974)).
[175] In an attempt to argue for the enforceability of the non-reliance clause in this case, Vanderlande suggests that "negligent misrepresentation does not fall within the discrete fraud exception to the merger doctrine." Def.'s Reply 15 (quoting *Robinson*, 2000 UT App 200, ¶ 1). The merger doctrine, however, is a property-law doctrine, under

come to addressing this issue was in *Reperex v. Coldwell Banker Commercial*.[176] There, in response to claims for fraud and negligent misrepresentation by Reperex, Coldwell asserted that the non-reliance clause in the parties' contract precluded liability.[177] Coldwell had acted as broker in a transaction between Reperex and the owner of May's Custom Tile, in which Reperex was to purchase May's Custom Tile.[178] The contract between Reperex and Coldwell included a provision that stated that Reperex was not relying on any representations by Coldwell—who would not perform any verification itself—but instead, would rely on its own inspection and the representations of May's former owner.[179] The Utah Supreme Court held that *this* provision was enforceable to the extent that it merely clarified that Coldwell was "acting only as a conduit for representations from the seller" and that Reperex agreed "to look only to the seller as to the accuracy of any of those representations."[180] The Court then held that, nonetheless, Reperex alleged that Coldwell committed its own fraud and negligent misrepresentation and that this was not itself covered by the terms of the non-reliance provision.[181]

The court predicts that the Utah Supreme Court would hold that a blanket non-reliance clause does not categorically insulate a party from its own negligent misrepresentations that induced the formation of the contract containing the non-reliance clause, at least in circumstances where, as here, omissions are at issue.[182] First, the Utah Supreme Court has

---

which the contract between a buyer and seller of real property is "merged" into the deed, and the deed becomes the only enforceable agreement. *Robinson*, 2000 UT App 200, ¶ 11. Thus, *Robinson* is inapposite.
[176] 2018 UT 51.
[177] *Id.* at ¶¶ 5–9.
[178] *Id.* at ¶ 5.
[179] *Id.* at ¶ 21.
[180] *Id.* at ¶ 26.
[181] *Id.* at ¶ 29.
[182] The clause at issue states that the "Agreement is executed without reliance upon any representation by any person concerning the nature or extent of damages or legal liability . . . ." Ludvik-Vanderlande Settlement ¶ 12. It is silent as to omissions.

been clear that any "contract clause limiting liability will not be applied in a fraud action" since "[t]he law does not permit a covenant of immunity which will protect a person against his own fraud on the ground of public policy."[183] Under Utah law, "[n]egligent misrepresentation is a form of fraud."[184] Thus, the same result should apply between these related torts. Second, the policy behind holding unenforceable contract provisions that waive liability for fraud and themselves were procured by fraud applies with nearly equal force to similar provisions procured by negligent misrepresentation. Third, this position has been adopted by the Second Restatement of Contracts[185]—which is relied upon by Utah courts[186]— and some other states.[187] Fourth and finally, the court notes that this holding is consistent with its prior decisions applying Utah law in this area.[188]

In sum, neither the merger clause nor the non-reliance clause precludes Ludvik's cause of action for negligent misrepresentation when the misrepresentation itself allegedly induced the formation of the contract containing those clauses.

---

[183] *Lamb*, 525 P.2d at 608.

[184] *Atkinson v. IHC Hospitals, Inc.*, 798 P.2d 733, 737 (Utah 1990); *see also Christenson*, 666 P.2d at 305.

[185] *See* Restatement (Second) of Contracts § 196 (Am. L. Inst. 1981) ("A term unreasonably exempting a party from the legal consequences of a misrepresentation is unenforceable on grounds of public policy."); *id.* cmt. *a*. ("The rule stated in this Section applies to non-fraudulent as well as fraudulent misrepresentations. It does not, however, apply to . . . language that prevents reliance by the recipient on a misrepresentation or that makes his reliance unjustified, but *such language is not effective unless it actually has the asserted effect and is not a mere recital that it does*." (citations omitted) (emphasis added)).

[186] *See, e.g.*, *Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 9 n.3, 266 P.3d 814; *Andreini v. Hultgren*, 860 P.2d 916, 921 (Utah 1993).

[187] *See, e.g.*, *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 74 (Colo. 1991); *Ivar v. Elk River Partners, LLC*, 705 F.Supp.2d 1220, 1240 (D. Colo. 2010) (applying Colorado law); *Slack v. James*, 614 S.E.2d 636, 618 (S.C. 2005); *Andes v. Albano*, 853 S.W.2d 936, 941 (Mo. 1993). *But see, e.g.*, *Snyder v. Lovercheck*, 992 P.2d 1079, 1084–89 (Wyo. 1999) (holding non-reliance clause could not bar an action for fraud, while it could bar an action for negligent misrepresentation); *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1062 (Del. Ch. 2006); *McBeth v. Prges*, 171 F.Supp.3d 216, 225–26 (S.D.N.Y. 2016) (applying New York law).

[188] *See Paskenta Enters. Corp. v. Cottle*, No. 1:17-cv-00033-JNP-BCW, 2018 WL 522322, *3–5 (D. Utah Jan. 22, 2018); *Preventative Entergy Solutions, LLC v. nCap Ventures 5 LLC*, No. 2:16-cv-00809-PNW, 2017 WL 87028, *4–5 (D. Utah Jan. 10, 2017).

### 2.   Mutual Releases

Vanderlande next argues that the parties released "all claims, whether of tort, contract or otherwise" that were related to their subcontract,[189] and that Ludvik's negligent misrepresentation necessarily falls under the release provision.[190] Ludvik responds that the parties expressly exempted the pass-through claims from the release, and because Ludvik's negligent misrepresentation claim arises from the pass-through claims, it was not released.[191]

"Under Utah law, '[r]eleases are contractual provisions and should be interpreted according to well-developed rules of contract interpretation.'"[192] However, a preinjury release must be clear and unambiguous.[193] An example of a release that was clear and unambiguous may be found in *Pearce v. Utah Athletic Foundation*.[194] The preinjury release there read:

> [Plaintiff] hereby release[s] . . . the UAF . . . from any and all liability, claims, demands, and causes of action whatsoever arising out of or related to any loss, damage, or injury . . . that may be sustained by me/my minor child . . . arising out of or related to my/my minor child's use of the sports facilities or participating in the sports.[195]

The release provision here is fundamentally the same.

Contrary to Ludvik's argument, the release provision would extinguish the negligent misrepresentation claim.[196] First, the release unambiguously applies to "any and all" tort

---

[189] Ludvik-Vanderlande Settlement ¶ 5.a.

[190] Def.'s Mot. 26–27. Vanderlande also obliquely argues that Ludvik must rescind the Settlement Agreement before it can sue for damages. *Id.* Vanderlande cites *Thurston v. Block United LLC* for the proposition that "[U]nder Utah contract law, a party who has been induced to enter a contract by fraudulent misrepresentations has two options: (1) it may elect to rescind the contract or (2) it may affirm the contract." 2021 UT App 80, ¶ 16, 496 P.3d 268. Vanderlande neglected to cite the next sentence from *Thurston*: "In either instance, the defrauded party may recover damages associated with the fraud." *Id.* Thus, Ludvik is perfectly entitled to sue for negligent misrepresentation while affirming the Settlement Agreement.

[191] Pl.'s Opp'n. 33–34.

[192] *Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 9, 48 P.3d 941 (quoting *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 267 (Utah 1995)).

[193] *Rutherford v. Talisker Canyons Fin. Co., LLC*, 2019 UT 27, ¶ 19, 445 P.3d 474; *Simonson v. Travis*, 728 P.2d 999, 1001 (Utah 1986) ("[A] release, to be enforceable, must at a minimum be unambiguous, explicit, and unequivocal.").

[194] 2008 UT 13, 179 P.3d 760, *abrogated on other grounds Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, 423 P.3d 1150.

[195] *Id.* ¶ 5 n.1.

[196] The release provision reads:

30

claims "arising out of" the Airport Project. Plainly, this would cover the negligent

misrepresentation claim, absent an exception, since the claim was directly related to Ludvik's

and Vanderlande's contractual relationship on the Airport Project. Ludvik urges that the

carveout provisions apply, since, at the very least, Ludvik's claim "arises out of"

Vanderlande's failure to present Ludvik's claims to HDJV.[197] However, this misconstrues the

provision. The provision only exempts from the release Vanderlande's "liability for failing to

present" Ludvik's pass-through claims to HDJV; it does not include tangential claims "arising

out of" that failure to present. Thus, the plain language of the release covers Ludvik's tort

claim, and no carve-out provision applies.

---

a. Except as provided herein, [Ludvik] hereby releases [Vanderlande] from any and all claims, whether of tort, contract or otherwise, or of whatsoever nature, arising out of or under or relating to the Subcontract, any work remaining under the Subcontract or the Project. [Ludvik] does not release [Vanderlande] from:

(1) the [Ludvik] Pass-Through Claims to the extent that [Ludvik] suffered damages and harm as a result of [HDJV's] actions or inactions. In such case, [Vanderlande] is liable to [Ludvik] for [Ludvik's] damages and costs but only as, when, and to the extent [Vanderlande] receives payment from [HDJV] or its surety or [Salt Lake City] for [Ludvik's] damages or costs;
(2) the payment of any money to be paid, or paid and received from, or on behalf of [HDJV] for the [Ludvik] Pass-Through Claims, and [Vanderlande] shall be liable to [Ludvik] for the amounts received from [HDJV] on account of the [Ludvik] Pass-Through Claims with credit for all monies to be paid to [Vanderlande]. It is the intent of the parties that no release contained herein results in a release of [HDJV] of any [Ludvik] Pass-Through Claims.
(3) liability for failing to present [Ludvik's] claims referenced in the emails to [HDJV] dated February 4, 2019 from [Vanderlande], February 18, 2019 from [Vanderlande], and August 15, 2019 from [Vanderlande] . . . .

This Agreement and this release is not intended and should not be interpreted to act as a release of [HDJV] of any [Ludvik] Pass-Through Claims. It is agreed that [Vanderlande's] liability with regard to the [Ludvik] Pass-Through Claims herein reserved is limited solely to the final award, judgment and/or settlement, and payment on the [Ludvik] Pass-Through Claims by or on behalf of [HDJV] or its surety or [Salt Lake City] either through negotiation, mediation, arbitration, or litigation.

Ludvik-Vanderlande Settlement ¶ 5.a. Paragraphs 5.b. and 5.c of the release provision specify items that are or are not expressly released, and conclude: "Except as expressly provided for herein, the release described above is a full and final release applying to all claims and losses, including, but not limited to, damages, costs, expenses, and attorneys' fees, incurred by [Ludvik], arising out of or in any way connected with the [Ludvik] Work or the Subcontract." *Id.* ¶ 5.b. to 5.c.
[197] *See* Pl.'s Opp'n. 33.

However, the court holds that under Utah law a release provision is unenforceable to the extent that it purports to release a party from liability for negligent misrepresentation, when the provision itself was procured by a negligent misrepresentation. While the Utah Supreme Court has not considered this precise issue,[198] it has held that a release provision is unenforceable when it was the result of fraud.[199] Consistent with the analysis in the preceding subsection, the court predicts that the Utah Supreme Court would extend its holdings on fraud claims to negligent misrepresentation claims.

Thus, while Ludvik's release would cover Ludvik's negligent misrepresentation claim, the release is ineffective in releasing that claim under these circumstances.

## III.   Breach of Contract and Breach of Good Faith and Fair Dealing Claims

Vanderlande seeks summary judgment only as to the portion of Ludvik's breach of contract and good faith and fair dealing claims.[200] The court first addresses breach of contract and then turns to breach of the implied covenant of good faith and fair dealing.

### A.  Breach of Contract

The elements for breach of contract under Utah law are: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[201]

---

[198] *Cf. Berube v. Fashion Centre, Ltc.*, 771 P.2d 1033, 1039 (Utah 1989) (holding a preinjury release does release a claim for negligent misrepresentation when the contract containing the release was not itself procured by misrepresentation); *Child v. Newsom*, 892 P.2d 9, at 10 n.2 (Utah 1995) (avoiding the issue of whether a release should be invalidated due to a negligent misrepresentation); *Atkinson*, 798 P.2d at 737–38 (holding that there was no negligent misrepresentation or fraud).

[199] *See Ong Intern.*, 850 P.2d at 453; *Lamb*, 525 P.2d at 608 ("[A] contract clause limiting liability will not be applied in a fraud action. . . . A contract limitation on damages or remedies is valid only in the absence of allegations or proof of fraud."); *see also Velocity Press v. Key Bank, NA*, 570 F. App'x. 783, 792 (10th Cir. 2014).

[200] *See* Def.'s Mot. 27 n.6, 36 n.8.

[201] *Bair v. Axiom Design, LLC*, 2001 UT 20, ¶ 14, 20 P.3d 388, *abrogated on other grounds as recognized in A.S. v. R.S.*, 2017 UT 77, 416 P.3d 465.

Vanderlande first argues that Ludvik has failed to allege sufficient facts to support its breach of contract claim.[202] This court already ruled on that issue in Vanderlande's prior Motion to Dismiss.[203] Next, Vanderlande makes two arguments in an attempt to show Ludvik cannot carry its burden on the elements of a breach of contract claim: (1) Vanderlande's signing of post-settlement change orders was not a breach and, even if it was, it did not damage Ludvik; and (2) the Vanderlande-HDJV Settlement was not a breach of the Settlement Agreement and, even if it was, it could not have damaged Ludvik. The court addresses each in turn.

### 1. Post-Settlement Change Orders

First, Ludvik has not provided sufficient evidence of a breach of the Settlement Agreement. A breach of a contract exists when "one party fails to satisfy the obligations it has undertaken."[204] In the Settlement Agreement, Vanderlande agreed to "take reasonable steps necessary to support" Ludvik's pass-through claims and "to cooperate and participate" with Ludvik in pursuing its claims.[205] The Settlement Agreement further specifies what types of actions Vanderlande is bound to take with regard to cooperation, and what actions are excluded from this duty.[206] The issue then, is whether Vanderlande failed to satisfy any of these obligations by signing post-settlement change orders with HDJV.

The undisputed facts show that Vanderlande did in fact assist in preparing and did in fact submit Ludvik's pass-through claim to HDJV in September 2020.[207] While Vanderlande also signed several change orders between August (the time of the Ludvik-Vanderlande

---

[202] Def.'s Mot. 27.
[203] Transcript of Proceedings at 18–19.
[204] *Guardian Title Co. of Utah v. Mitchell*, 2002 UT 63, ¶ 18, 54 P.3d 130.
[205] Ludvik-Vanderlande Settlement ¶¶ 3, 6.
[206] *Id.* at ¶¶ 6.b. to 6.c.
[207] *See* Alewelt Aff. ¶¶ 24–25; Nov. 5, 2020 Letter from Alewelt to Tyler 1.

settlement) and December 2020 (the time of the Ludvik-HDJV mediation and settlement), these change orders do not contain any language indicating that Vanderlande was waiving any claims against HDJV.[208] Ludvik suggests that the following language acts as a bar: "Subcontractor agrees that this [Subcontract Change Order] incorporates in the Subcontract all requests for change orders [and] claims for additional compensation . . . through the date of this SCO."[209] This language appeared in each of the change orders signed by Vanderlande.[210] But Ludvik has not shown how this language would operate as a bar to Ludvik's pass-through claims, or how it would have otherwise breached the Settlement Agreement.

Second, even if Vanderlande's signing of post-Settlement Agreement change orders was a breach of the Settlement Agreement, such actions could not have damaged Ludvik as a matter of law. "To prove damages, the plaintiff must [first] prove the fact of damages. The evidence must do more than merely give rise to speculation that damages in fact occurred; it must give rise to a reasonable probability that the plaintiff suffered damage as a result of the breach."[211] Generally, damages for a breach of contract are meant to restore the non-breaching party to the position that it would have been in absent a breach.[212]

Here, Ludvik does nothing more than point to the post-settlement change orders, and it certainly does not suggest how there is a "reasonable probability" that damages occurred by the signing of those change orders. As Vanderlande demonstrates, since all change orders signed by Vanderlande—both pre- and post-Settlement Agreement—contained the language cited above, even if that language waived Ludvik's pass-through claim after settlement, the

---

[208] *See* Change Orders 32 through 36.
[209] *See* Pl.'s Opp'n. 17, 34.
[210] *See, e.g.*, Change Orders 32 through 36.
[211] *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985).
[212] *See Mahmood v. Ross*, 1999 UT 104, ¶ 20, 990 P.2d 933.

claim must then have been waived prior to settlement as well. Thus, Ludvik would be in the same position pre- and post-breach, and it could not have been damaged.

## 2. Vanderlande's Settlement with HDJV

Vanderlande makes two arguments to show that its settlement with HDJV was not a breach of its Settlement Agreement with Ludvik: (1) that Ludvik did not allege in its complaint that Vanderlande breached the Settlement Agreement by later settling with HDJV; and (2) either way, Ludvik had already released its pass-through claims against HDJV by the time Vanderlande settled with HDJV and had agreed to indemnify HDJV for any pass-through claims asserted by Vanderlande arising out of the Vanderlande-HDJV subcontract.[213] Ludvik's only response is that its pass-through claims did not belong to it, and that as a matter of law, it could not waive them.[214]

Because the court finds that Vanderlande's second argument is persuasive, it declines to address the first.[215] As above, "[t]o prove damages, the plaintiff must [first] prove the fact of damages. The evidence must do more than merely give rise to speculation that damages in fact occurred; it must give rise to a reasonable probability that the plaintiff suffered damage as a result of the breach."[216]

The undisputed facts show that Salt Lake City, HDJV, and Ludvik executed a settlement agreement on December 9, 2020.[217] Under the HDJV-Ludvik settlement, however, Ludvik released HDJV from pass-through claims asserted by Vanderlande on behalf of

---

[213] Def.'s Mot. 32–34.
[214] Pl.'s Opp'n. 35.
[215] Even if Vanderlande was correct in that failure to plead certain factual theories to support a claim may preclude a party from proceeding under those factual theories, Ludvik could simply move for leave to amend its complaint to add those supporting facts to its breach of contract claim. *See* Wright & Miller, *supra* note 127, at § 2722 (noting the possibility of amending pleadings in response to a motion for summary judgment); *id.* § 1219 (discussing the "theory of the pleadings doctrine"—which required counsel to set forth the *legal* theory of the case in order to proceed under that theory—which was abolished by the Federal Rules of Civil Procedure).
[216] *Atkin Wright & Miles*, 709 P.2d at 336.
[217] Ludvik-HDJV Settlement.

Ludvik and agreed to indemnify HDJV for Vanderlande's assertion of such claims.[218] Setting aside whether Ludvik could waive the pass-through claims,  Vanderlande is correct that the indemnification provision means that Ludvik could not have been damaged by Vanderlande's subsequent waiver of the pass-through claims. Hypothetically, if, after the Ludvik-HDJV settlement Vanderlande had not settled with HDJV, and instead, had insisted on Ludvik's pass-through claims, and if HDJV granted those claims and paid Vanderlande for them, Ludvik would have been bound to reimburse HDJV for any money paid to Vanderlande, per the indemnification provision. Vanderlande would be then obliged to provide Ludvik with all recovery on the pass-through claims save the amount it could deduct for its own expenses, plus $1 million.[219] In other words, Ludvik would effectively be paying itself for its own pass-through claims, minus deductions from Vanderlande. Under these circumstances, Vanderlande's subsequent settlement with HDJV did not damage Ludvik in any way.

Thus, because the court finds that Ludvik could not carry its burden of proof on the damages element of its breach of contract claim, summary judgment is appropriate.

### B.  Breach of the Implied Covenant of Good Faith and Fair Dealing

All contracts in Utah include the implied covenant of good faith and fair dealing, under which "each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract."[220] The Utah Supreme Court has been clear that the "implied covenant of good faith and fair dealing performs a significant but perilous role in the law of contracts," and for that reason, there is "a limited role for the covenant of good faith and fair dealing."[221]

---

[218] *Id.* at ¶¶ 6, 9.
[219] *See* Ludvik-Vanderlande Settlement ¶ 7.
[220] *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991); *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193.
[221] *Young Living Essential Oils*, 2011 UT 64, ¶ 8.

Vanderlande makes two arguments with regard to this claim. First, it argues that where there is no breach of a contract, there is no breach of the implied covenant of good faith and fair dealing.[222] Vanderlande misreads Utah caselaw. Indeed, "[a] violation of the covenant gives rise to a claim for breach of contract."[223] "Recovery under one claim is not limited by or tied to recovery under another claim."[224] The language that Vanderlande latches onto comes from *America West Bank Members, L.C. v. State*.[225] The case does indeed state that "[a] claim for breach of the covenant of good faith and fair dealing is . . . derivative of [a] breach of contract claim,"[226] but the court was referring to a particular factual scenario not at issue here. There, the Utah Supreme Court held that the plaintiff had not adequately alleged, for purposes of a motion to dismiss, the *existence* of a contract.[227] Thus, without an allegation of the existence of a contract, there likewise could be no breach of the implied covenant of good faith and fair dealing.[228] The facts here are completely different. Vanderlande does not challenge the existence of a valid contract. As Utah courts have repeatedly affirmed, breach of contract and breach of the implied covenant of good faith and fair dealing are separate causes of action that may be alleged and proved without reliance on one another.[229] Thus, the court's disposition of Ludvik's breach of contract claim does not affect its disposition of Ludvik's claim for breach of the implied covenant of good faith and fair dealing.

Second, Vanderlande argues that Ludvik cannot meet its burden at trial on the elements of a breach of the implied covenant of good faith and fair dealing, because

---

[222] Def.'s Mot. 34–35.
[223] *St. Benedict's*, 811 P.2d at 200.
[224] *Eggett*, 2004 UT 28, ¶ 23.
[225] 2014 UT 49, 342 P.3d 224.
[226] *Id.* ¶ 19.
[227] *Id.* ¶ 18.
[228] *Id.* ¶ 19.
[229] *See, e.g.*, *St. Benedict's*, 811 P.2d at 200; *Eggett*, 2004 UT 28, ¶¶ 22–23; *Christiansen v. Farmers Ins. Exchange*, 2005 UT 21, ¶ 13, 116 P.3d 259; *Terry v. Hinds*, 47 F.Supp.3d 1265, 1274–75 (D. Utah 2014).

Vanderlande did not sign post-settlement change orders with the intent or purpose of harming Ludvik, and because such signing did not harm Ludvik.[230] Vanderlande misconstrues Ludvik's claim. Vanderlande incorrectly argues that Ludvik's claim is based upon the same conduct alleged in its breach of contract claims—that is, signing of post-settlement change orders.[231] However, Ludvik's Amended Complaint makes clear that its claim is based upon Vanderlande's failure "to inform [Ludvik] that it had waived and released [Ludvik's] Pass-Through Claims and continued to behave and conduct itself as if [Ludvik's] Pass-Through Claims were still enforceable against [HDJV]."[232]

However, Vanderlande is correct that Ludvik cannot carry its burden of proof on this claim. Ludvik's claim for a breach of the implied covenant of good faith and fair dealing is premised on conduct that occurred before the formation of the contract at issue. Naturally, Vanderlande could not have intentionally interfered with Ludvik's rights to receive the fruits of the Settlement Agreement before the Settlement Agreement itself had been executed. And the implied covenant of good faith and fair dealing "does not deal with good faith in the formation of the contract"; such conduct is governed by "the law of torts."[233] Indeed, Ludvik's claim for a breach of the implied covenant of good faith and fair dealing almost precisely duplicates its claim for negligent misrepresentation. The tort of negligent misrepresentation is the vehicle that could provide a remedy for Vanderlande's alleged conduct; the implied covenant of good faith and fair dealing is not.

Therefore, the court grants Vanderlande summary judgment on this claim, since Ludvik cannot carry its burden at trial.

---

[230] Def.'s Mot. 35.
[231] Def.'s Mot. 35.
[232] Am. Compl. ¶ 84.
[233] Rest. 2d Contracts § 205, cmt. *c*.

## ORDER

For the forgoing reasons, Vanderlande's Motion for Partial Summary Judgment[234] is

GRANTED in part and DENIED in part.

Signed December 19, 2023.

BY THE COURT

_____
David Barlow
United States District Judge

---

[234] Def.'s Mot., ECF No. 64.